## McCOMB v. ANTONIO ROIG SUCRS. S. EN C.

Civ. No. 5018.

United States District Court
D. Puerto Rico, San Juan Division.

Feb. 18, 1949.

Kenneth P. Montgomery, of San Juan, Puerto Rico, for plaintiff.

James R. Beverley, of San Juan, Puerto Rico, for defendant.

CHAVEZ, District Judge.

This is an action for injunction brought by the Administrator of the Wage and Hour Division of the United States Department of Labor. The Administrator seeks to enjoin the defendant from violating Sections 7, 11(c) and 15(a) (1), 15(a) (2), 15(a) (5) of the Fair Labor Standards Act of 1938. 29 U.S.C.A. § 201 et seq.

The defendant denies that the Act has been violated and affirmatively alleges that during the grinding season all of the workers referred to in the complaint are exempt under the provisions of Section 7(c) of the Act and certain employees exempt under the provisions of Sec. 13(a) (1).

Defendant Antonio Roig Sucrs., S. en C., is a partnership which operates the sugar mill known as Central Roig at Yabucoa, P.R. The employees of defendant are engaged in processes or occupations necessary to the production of sugar and molasses, for interstate commerce.

Since the spring of 1946 certain of defendant's employees have been paid according to a plan established by the terms of letters issued by the defendant, said letters being marked Exhibits "A" and "B" and attached to the stipulation of facts. The general plan of compensation under the contracts provide for basic hourly rates of pay ranging from 47¢ to 70¢ per hour and for payment at not less than time and a half after the first 40 hours in each week for all hours worked in excess of 40 in any workweek. The contracts also provide for guaranteed minimum weekly salaries ranging from $25 to $50 per week.

The plaintiff concedes that the employees in question in this case are, during the grinding season, exempt from the over-

time provisions oı the Act because they are within the meaning of Sec. 7(c) of the Act.

Thus the controversy in this case is confined to the eleven employees listed in Exhibit "F", which is included in the stipulation of facts. Of these 11 employees, three (3) of them are exempt under the terms of stipulation of fact No. 10 which reads as follows: "X—Defendant contends and plaintiff does not deny, that the employees listed below are exempt from the overtime provisions of Sec. 7 of the Fair Labor Standards Act for the reasons indicated. However, defendant admits that the contracts of employment under which these employees have been working were intended to provide compensation in accordance with the provision of Sec. 7 of the Act:"

1. Crispin Ramos—Chief of the mechanical department for defendant's agricultural department which works only on farm equipment used on lands farmed by defendant.—Claim exempt as engaged in agriculture within the meaning of Sec. 3(f) and 13(a) (6) of the Act.

6. Zoilo A. Burset—Cashier—handles disbursements of money, checks, pay rolls, serves as office manager—exempt as engaged in an administrative capacity within the meaning of Sec. 13(a) (1) and the Administrator's Regulation.

7. Agapito Jimenez—Clerk—in the agricultural department, handling details relating to farming of defendant's lands.

Thus the issue is limited to the following eight (8) employees shown on Exhibit "F" and the supplemental stipulation of facts:

1. Luis A. Davila—Clerk
2. Victor Gonzalez—Telephone Operator
3. Antonio Molina—Clerk
4. Monchita C. de Ortiz—Clerk
5. Martin Ortiz Rigau—Warehouseman
6. Sixto Pesante—Minor Surgeon
7. Fernando Rodriguez—Clerk
8. Tomas Ruiz—Mechanic

The supplemental stipulation of facts sets out the names of these employees; the amount of the weekly guaranty; the total number of hours worked each week; the hourly rate and the total wages paid each week. The period covered is from June 18, 1947 to January 14, 1948, or 31 weeks.

The parties also stipulated that the hourly rates and the minimum weekly guaranty to each employee was not less than the minimum hourly rate prescribed by law.

The grinding of sugar cane into sugar in Puerto Rico is a seasonal occupation and is divided into two seasons, as follows: (a) the grinding season or "zafra" which generally runs from approximately January 1 to June 1, of each year and the "dead" season which commences from about June 1st to December 31.

An analysis of the supplemental stipulation of facts shows the following as to the 8 employees involved in this suit:

Luis A. Davila—weekly guaranty—$30; hourly rate 47 cents per hour. During 9 weeks employee worked varied hours 64, 82 and 67 hours per week and was paid more than the weekly guaranteed rate. He was given 2 weeks vacation and paid the weekly guaranteed rate. During 20 weeks he worked less than 40 hours per week averaging from 28 to 39 hours per week and was paid the guaranteed weekly rate.

Victor Gonzalez—weekly guaranty $27.26 —hourly rate 47¢ per hour. During 15 weeks he worked 52 hours per week and was paid $27.26, figured at the contract rate of 47¢ per hour for the first 40 hours and time and a half for all hours worked over and above 40 hours. Fifteen weeks he worked 61 hours and was paid according to the contract rate per week the sum of $34.78. One week was taken as sick leave and he was paid the sum of $27.26.

Antonio Molina—weekly guaranty $40. Hourly rate of pay 47¢. During the period Molina worked 25 weeks and received the guaranteed weekly rate and worked from 16, 41, 47 to 58 hours per week. Two weeks for vacation during which he received the regular weekly guaranty and 4 weeks he worked 72 and 84 hours per week and received the regular contract rate plus time and a half or the sum of $56.40 and $45.12 per week.

Monchita C. de Ortiz—weekly guaranty $25 per week; hourly rate 47¢ during 29 weeks of the period covered, employee worked hours varying from 14, 28, 39½ and 47 hours per week and received the $25 weekly guaranty. One week was taken for vacation and one for sick leave and during these 2 weeks employee received the regular $25 weekly guaranty.

Martin Ortiz Rigau—weekly guaranty $33.84; hourly rate of pay 47¢. During the period involved employee worked 23 weeks at hours varying from 27, 45, 50, 54 to 55 hours per week and received the regular $33.84 weekly guaranty. Six weeks employee worked 63 and 70 hours per week and received payment over and above the guaranteed weekly rate figured at the contract rate in the sum of $36.66 and $43.24 per week. Two weeks vacation and employee received the $33.94 weekly guaranty.

Sixto Pesante—weekly guaranty $30; hourly rate 47¢. During the period employee worked 27 weeks and received the regular weekly guaranty of $30. The hours worked varied from 28, 32½, 44½ to 48 hours per week. Two weeks vacation leave employee was paid the weekly guaranty and one week not shown in payroll, employee was paid the weekly guaranty.

Fernando Rodriguez—weekly guaranty $37; hourly rate of pay 47¢ during said period employee worked 22 weeks at hours varying from 32, 36 to 39 hours per week and was paid the $37 weekly guaranty. Seven weeks he worked hours varying from 44, 51 to 52 hours per week and employee was paid $41.36 per week. Two weeks vacation leave employee received the $37 weekly guaranty.

Tomas Ruiz—weekly guaranty $24.44, hourly rate of pay 47¢; employee worked hours varying from 16, 36, 40 to 48 hours per week and received $24.44 weekly guaranty during the entire period.

A recapitulation of the above shows that during the 31 week period the eight employees worked 178 weeks at the guaranty rate; 58 weeks at the contract rate and/or more than the contract rate for 12 weeks sick and vacation leave when employees were paid the weekly guaranty. Thus during approximately one third of the 31-week period, the employees received more than the guaranteed rate.

An analysis of the compensation of employees shows the following number of overtime hours that an employee had to work in order to reach the guaranty rate ·

| Name | Overtime hours to reach guaranty |
| --- | --- |
| Luis A. Davila | 15 |
| Victor Gonzalez | 12 |
| Antonio Molina | 30 |
| Monchita C. de Ortiz | 8½ |
| Martin Ortiz Rigau | 21 |
| Sixto Pesante | 15 |
| Fernando Rodriguez | 25 |
| Tomas Ruiz | 8 |

Plaintiff in this case relies upon the following cases: Walling v. Harnischfeger Corporation, 325 U.S. 427, 65 S.Ct. 1246, 89 L.Ed. 1711; Walling v. Helmerich & Payne, 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29; Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 65 S.Ct. 1242, 89 L.Ed. 1705; McComb v. Sterling Ice & Cold Storage, 10 Cir., 165 F.2d 265; 149 Madison Ave. Corporation v. Asselta, 331 U.S. 199, 67 S.Ct. 1178, 91 L.Ed. 1432, 169 A.L.R. 1293; United States v. Rossenwasser, 323 U.S. 360, 65 S.Ct. 295, 89 L.Ed. 301; Overnight Motor Transp. Company v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682.

Defendant relies upon Walling v. A. H. Belo Corporation, 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716; and Walling v. Halliburton, Oil Well Cementing Co. 331 U.S. 17, 67 S.Ct. 1056, 91 L.Ed. 1312.

Plaintiff in his reply brief argues that the Belo & Halliburton cases must be construed in the light of other decisions of the Supreme Court and in the light of decisions of lower courts interpreting the Supreme Court's decision. Plaintiff principally relies upon McComb v. Sterling, supra.

In Walling v. A. H. Belo Corporation, 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716, the contract provided a basic rate of pay of 67 cents per hour for the first 40 hours

each week and not less than time and a half for overtime with a guaranty of not less than $40 per week. Thus the employer was required to pay more than the weekly guaranteed rate when the employee worked enough hours at the contract rate to earn more than the guaranty.

The question in this case turned upon the meaning of the statutory term "regular rate". The Court said that even though as a matter of law the employer and employee may establish the "regular rate" the difficulty arose from the inclusion of the $40 guaranty and that "the problem is whether the intention of the parties to set 67¢ an hour as the regular rate squares with their intention to guarantee a weekly income of $40." The Administrator argued that the two objectives were inherently inconsistent and that the intention to fix the regular hourly rate at 67¢ was overridden by the intention to guarantee the $40 per week.

The Court in refusing to follow the contention of the Government stated: "We cannot agree. In the first place when an employee works more than 54½ hours in a single week, he is admittedly entitled to a $40 guaranty. The record shows that in such a case the employee is paid at the rate of $1 an hour (150% x $.67) for each hour of overtime. In this situation, then, it is clearly the guaranty that becomes inoperative and the 67 cent hourly rate fixed by the contract that is controlling."

In effect the Court held that the guaranty bore a reasonable relation to the hourly contract rate and laid down the principle that there must be a reasonable relation between the weekly rate guaranteed and the hourly rate under the contract.

The Court in the Belo case recognized the distinction between it and the facts in the case of Overnight Motor Transportation Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682, and calls attention to the fact that in the contract in the Missel case there is no stated hourly wage and no provision for overtime.

In Overnight Motor Transportation Co. v. Missel, supra, the respondent Missel's salary until November 1, 1938 was $25.50 per week and thereafter $27.50 per week.

The time records were only available for a third of the critical period showing an average workweek of 65 hours with a maximum of 80 for each of two weeks in the first year of the Act's operation and a maximum of 75 hours in each of three weeks in the second year. Nothing above the weekly wage was paid, because these maximum workweeks, computed at the statutory minimum rates with time and a half for overtime for the years in question, would not require an addition to the weekly wage. In this case, unlike the Belo case, there was no stated hourly wage and no provision for overtime compensation.

In the Missel case the Court held that where the employment contract is for a fixed weekly wage and variable or fluctuating hours of work, the "regular rate" in the statutory sense, for any particular week, is the quotient of the amount paid per week divided by the number of hours worked in that week.

In Walling v. Halliburton Oil Well Cementing Co., 331 U.S. 17, 67 S.Ct. 1056, 1057, 91 L.Ed. 1312, the contract provided for "a regular basic rate of (specified number of) cents per hour for the first 40 hours of any workweek, and not less than one and one-half times such basic hourly rate of pay for all time over 40 hours in any workweek, with a guarantee that Employee shall receive for regular time and for such overtime as the necessities of the business may demand a sum not less than $(a specified number) for each workweek."

The Court in this case followed the Belo case and distinguished the Belo case from other cases. The Court said:

"In Walling v. Helmerich & Payne, Inc., 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29, we considered a 'split-day plan' under which a prescribed 'regular' hourly rate was payable for the first four hours of each eight-hour shift and a prescribed 'overtime' rate, of one and one-half the 'regular' rate, was payable for the other four hours. In those weeks in which an employee worked statutory overtime, he was paid at the contract 'overtime' rate for many straight-time hours and at the contract 'regular' rate for many overtime

hours. Obviously, these prescribed rates were not actual regular and overtime rates, although so named in the plan. Consequently, as in Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682, we held that the regular rate was to be determined by dividing the wages actually paid by the hours actually worked. In so deciding, we expressly noted that Belo was not controlling because the wage plans involved in the two cases posed entirely different questions as to the application of § 7(a).

"In Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 65 S.Ct. 1242, 1250, 89 L.Ed. 1705, and Walling v. Harnischfeger Corp., 325 U.S. 427, 65 S.Ct. 1246, 1250, 89 L.Ed. 1711, the contracts established two alternative methods for computing each employee's wages. One was to multiply his straight-time hours of work by a specified basic hourly rate, and his overtime hours by one and one-half that rate, and add the products. The other was to multiply the number of jobs done by a specified piecework rate. The employee was entitled to be paid the greater of these two sums. The method of computing the amount due at piecework rates, which were constant for work done on both straight-time and overtime hours, of course negated any possible inference that the payment of such amount contemplated legal overtime compensation. The specified hourly rates were so low, however, relative to piecework rates, that the latter were always, or almost always, determinative of the wage actually to be paid. These cases held merely that such specified hourly rates were not the 'regular' rates of wage payments to which they were not related, and which were computed according to a necessarily inconsistent method. Again, Belo was expressly distinguished."

The Court in the Halliburton case finally sums up as follows: "The reasons stated in the Belo opinion for rejecting this argument are equally valid today, and need not be repeated. Moreover, our holding in Belo, has been a rule of decision in this Court for five years, and recognized as such on each appropriate occasion. Knowing of the Belo decision, the Congress has permitted § 7(a) to stand un-

modified and the courts have applied it as so construed. Employers and employees (including those involved in this case) have regulated their affairs on the faith of it. Even if we doubted the wisdom of the Belo decision as an original proposition, we should not be inclined to depart from it at this time."

In 149 Madison Avenue Corporation v. Asselta, 331 U.S. 199, 67 S.Ct. 1178, 1184, 91 L.Ed. 1432, 169 A.L.R. 1293, prior to April 21, 1942, the contract was known as the Sloan Agreement, wherein employees were paid flat weekly wages for workweeks of specified length, which, in the case of most of the respondents, amounted to $25 for 47 hours of weekly employment. No hourly rates were specified, nor was any attempt made to compensate employees at the rate of time and one-half for hours worked in excess of 40 in any week.

The new contract provided for a workweek of 54 hours applicable to watchmen and a workweek of 46 hours for other regular employees. Weekly wages were established to compensate the 54 or 46 hours of labor, which sums were stated to include both payments for the regular hours of employment and time and one-half for the hours in excess of 40. To derive the hourly rate from the weekly wage, the following formula was included: "The hourly rates for those regularly employed more than forty hours per week shall be determined by dividing their weekly earnings by the number of hours employed plus one-half the number of hours actually employed in excess of 40 hours."

Under the agreement weekly compensation varied according to the number of hours worked in that week. Thus in case an employee was unable to work all his scheduled hours due to an "excusable cause", he was paid at the formula rate with the provision, however, that six of the hours worked should be compensated as overtime regardless of whether the total of hours actually worked was greater or less than 40 in that week. If the employee's absence was not excusable, he was apparently paid a sum for the week obtained by multiplying the number of hours actually worked times the formula rate,

being given credit for overtime only in case the number of hours worked exceeded 40. The agreement provided that all regular employees except watchmen should be compensated at a rate one and three-quarters times the hourly rate derived from the formula for hours worked in excess of 46. Watchmen were to be paid twice the formula rate for hours worked in excess of 54. Part-time workers employed for less than the scheduled workweek were hired at a specified schedule of hourly rates obtained by dividing the weekly wage paid the regular employees by the number of hours in the regular workweek.

The Court disposed of this case as follows: "It is sufficient to state that, after considering the terms of the agreement and the operation of the plan in actual practice, we have come to the conclusion that the agreement in this case was one calling for a workweek in excess of 40 hours without effective provision for overtime pay until the employees had completed the scheduled workweek and that the 'hourly rate' derived from the use of the contract formula was not the 'regular rate' of pay within the meaning of the Fair Labor Standards Act. This is not a case like Walling v. A. H. Belo Corporation, supra, or Walling v. Halliburton Oil Well Cementing Co., 331 U.S. 17, 67 S.Ct. 1056 [91 L.Ed. 1312]. Unlike those cases there was here no provision for a guaranteed weekly wage with a stipulation of an hourly rate which under the circumstances presented could properly be regarded as the actual regular rate of pay."

Plaintiff strongly relies upon the case of McComb v. Sterling Ice and Cold Storage Co., 10 Cir., 165 F.2d 265, and argues that the Belo case must be construed in the light of other decisions of the Circuit Courts and of the Supreme Court of the United States. In the Sterling case the contract called for a basic rate of pay for the first 40 hours each week and for time and a half such basic rate for all hours worked over 40 hours with a weekly guarantee of not less than $23.08. The argument was made and the District Court ruled that this was a Belo type contract. The Circuit Court of Appeals of the 10th Circuit reversed the District Court, Walling v. Sterling Ice and Cold Storage Co., 69 F.Supp. 669, principally on the ground that the contract in this case was not in fact a contract similar to the contract in the Belo case.

Under the facts of the Sterling case, although the contract provided for an hourly rate and for overtime payment for extra hours, the Company's books from August 1942 through April 1946 did not record the number of hours worked by the employees during such period of time. They recorded only the semi-monthly salary paid these employees. Thereafter the books were changed to show the number of hours worked by these employees. At no time did the company pay these employees any sum in excess of the maximum weekly guarantee provided in the contract or in excess of the sum carried on the books as the semi-monthly salary of the employees under their various salary raises.

The Circuit Court of Appeals in this case analyzed the Belo case, the Walling v. Youngerman-Reynolds Hardwood case, and the Walling v. Halliburton Oil Well Cementing Co. and then sets out the distinction between the Belo case and the Sterling case. The Court in the Sterling case calls attention to the fact that the company did not keep a record of the hours worked by the employees, thus indicating that no significance was attached to the number of hours that the employees were required to work and indicating further that the company attached no significance whatever to the contracts or to the hourly rate or to the provisions in the contract for one and one half time such hourly rate for hours in excess and that it considered the monthly salary as the true wage. The Circuit Court further distinguished this case from the Belo case in that not in a single instance was overtime payment paid in addition to the weekly guarantee provided for in the contract or in the sum representing the semi-monthly salary of the employees.

The Court did say in its comment in this case 165 F.2d on page 269, as follows: "From an analysis of these cases, we conclude that the correct rule to apply is that where employees work irregular hours under a contract fixing a regular hourly rate and providing time and one-half for over-

time and also for a weekly guarantee, the hourly rate must have been intended to determine the weekly wages which it was contemplated would be paid for both regular and for overtime work, at not less than one and one-half times the amount thereof; and that the weekly guarantee must be such a sum as the parties contemplated would ordinarily result from the application of the hourly rate to the regular and overtime hours, taking into consideration that the hours of work were not fixed and that they varied somewhat from week to week. If the hourly rate fixed in the contract was such that it did not reasonably determine the weekly wages intended to be paid to the employees, according to the nature of their employment, for both regular hours and one and one-half times such hourly rate for the overtime hours for such hours as they would ordinarily work, it would be a fictitious rate. In such a case, the weekly guarantee would constitute the real wage and would be used in computing and determining the hourly rate."

In Walling v. Uhlmann Grain Co., 7 Cir., 151 F.2d 381, 382, decided on October 17, 1945, the facts were as follows:

"Prior to the effective date of the Act, defendants' employees were paid on a weekly salary basis. Shortly before the Act became effective, each employee received a notice in his weekly pay envelope stating what his weekly salary had been and that he would be subject to call for 60 hours (48 hours for office girls and 53½ hours for messengers) in each work week. The notice further stated that the employee's 'normal rate of pay is —¢ per hour,' and that the employee would be paid overtime 'at the rate of one and one-half times this normal rate of pay.' * * *

"Both prior and subsequent to the effective date of the Act it was customary for the defendants to pay the sum of $2.00 to each employee working until 7 p.m. in any day. This was referred to as 'supper money.' It was paid without reference to the total hours worked in a day or week and without regard to the employee's rate of compensation. * * *

"The time worked by most of the employees each week averaged about 15 hours fewer than those to which they were subject to call, as set out in the notices. With one exception, the regular weekly salary and the nightly payment of $2.00 was the only compensation paid an employee, and this irrespective of the number of hours worked. The exception referred to was an instance where an employee who had worked long hours in a certain week was paid the additional sum of $50.00 in appreciation of the work performed by him."

In this case the Court held following Walling v. Youngerman-Reynolds Hardwood Co., supra, that the weekly rate could only be determined by dividing the total weekly compensation received by an employee by the number of hours worked. The Court then went on to say: "That this so-called hourly rate did not meet the realities of the situation is further shown from the fact that the amount of compensation received by an employee was the same, irrespective of the number of hours worked. Overtime work resulted in no additional compensation. The employees' wages, including the so-called 'supper money,' were determined by no different formula after the Act became effective than they had been theretofore. True, defendants' books disclose what purported to be regular and overtime compensation, but this was predicated, as already pointed out, upon an hourly rate which was artificially determined. Such a system, even though adopted in good faith as it perhaps was in the instant case, does not meet the requirements of the Act."

The Court distinguishes this case from the Belo case because the court below also placed controlling importance upon the Belo decision and the Court goes on to say that notwithstanding the Belo decision that: "subsequently, however, the Supreme Court on June 4, 1945 decided the Walling v. Harnischfeger Corporation [supra] and Walling v. Youngerman-Reynolds Hardwood Co., supra, which in our opinion effectively remove all grounds for relying upon the Belo case as controlling in the instant case."

The Circuit Court then concludes by saying: "If the Supreme Court has not repudiated its holding in the Belo case, it has come so close as to leave no room for its

8

application except upon an identical state of facts."

However, it should be noted that since Walling v. Uhlmann Grain Co. and the Harnischfeger cases, the Supreme Court on April 14, 1947, decided the Halliburton Company case reaffirming the Belo case.

It appears to the Court that the facts in this case are similar to the facts in Walling v. A. H. Belo and Walling v. Halliburton Oil Well Cementing Co. and that the decisions in those cases are controlling. The hourly rates were operative on many occasions as overtime payments were made in addition to the weekly guaranty provided in the contract; the company kept complete records of the number of hours the employees worked each week; the regular basic rate specified in the contract was in each instance not less than the minimum hourly rate provided by law; and the rate was so related to the guaranty weekly sum that the employee became entitled to more than the guaranty in those weeks in which he worked more than the number of overtime hours required to reach the guaranty rate. The hourly rate provided in the contracts in this case bear a reasonable relation to the guaranteed weekly rate.

Judgment will, therefore, be for the defendant and the complaint is ordered dismissed.