## McCOMB v. STERLING ICE & COLD STORAGE CO.

### No. 3522.

Circuit Court of Appeals, Tenth Circuit.
Dec. 26, 1947.

Frederick U. Reel, of Washington, D. C.
(William S. Tyson, Bessie Margolin and
Morton Liftin, all of Washington, D. C.,

and Reid Williams, of Denver, Colo., on the brief), for appellant.

Erskine R. Myer, of Denver, Colo. (John R. Turnquist, of Denver, Colo., and Charles W. Kreager, of Sterling, Colo., on the brief), for appellee.

Before BRATTON, HUXMAN and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

This was an action by the Administrator of the Wage and Hour Division of the Department of Labor seeking to enjoin the appellant, the Sterling Ice and Cold Storage Company,[1] from alleged violations of the Fair Labor Standards Act.[2] The controversy centers around a small number of employees admittedly engaged in commerce within the meaning of the Act. In August, 1942, the Company executed a contract with George Loose of which the following is the pertinent part. "In order to conform our employment arrangements to the scheme of the Act without reducing the amount of money which each employee receives each week, we advise that from and after July 31, 1942, your basic rate of pay will be 30 cents per hour for the first 40 hours each week, and that for time over 40 hours each week, you will receive for each hour of work not less than 1½ times such basic rate above-mentioned, with a guarantee on our part that you shall receive weekly for regular time and for such overtime as the necessities of the business may demand, a sum not less than $23.08."

Similar contracts were executed with other employees involved in this case, differing only as to the hourly rate and the weekly guarantee. It is not necessary to set out the other contracts in detail because they are all alike and the question in all of them is identical.

The original contracts remained in force until about March 20, 1944, when the minimum hourly rate was raised by law from 30 cents to 40 cents per hour. At that time new contracts were executed which read precisely like the old contracts except that the regular hourly rate fixed therein was raised to 40 cents, and the minimum weekly guarantee was raised to a sum to represent the weekly proportion of the monthly salary which was being paid to the employees at that time. To illustrate, in the case of Loose, the new contract guaranteed a sum of not less that $32.30, that representing the weekly portion of his monthly salary then being paid to him. While Loose's original contract was in force, his monthly salary was successively increased from $100 to $125 and then to $140. After the execution of his 1944 contract, he received monthly increases from $140 to $175, $192.50, and finally to $215. All the other employees also received periodic monthly increases in salary while both the original and the 1944 contracts were in effect. In each instance, the employee was advised orally of the increase in his monthly salary but signed no new contract, and was not advised of any change in the hourly rate or of any change in the weekly guarantee. Neither was there any change or alteration made in the contracts which the employees had signed.

Although the contracts provided for an hourly rate and for overtime payments for extra hours, the company's books from August, 1942, through April, 1946, did not record the number of hours worked by the employees during such period of time. They recorded only the semi-monthly salary paid these employees. Thereafter the books were changed to show the number of hours worked by these employees. At no time did the company pay any of these employees any sum in excess of the minimum weekly guarantee provided in the contract, or in excess of the sum carried on the books as the semi-monthly salary of the employees under their various salary raises. The president of the company testified that, "We checked * * * on several occasions and on no occasion did we find that the total time plus the overtime at time and one-half equaled the minimum guarantee as expressed in our wage contracts, but as to whether or not there might have been an exception to that occasionally, I cannot answer."

Prior to the execution of these contracts, the company did not consider itself subject to the provisions of the Act. Prior to that time, these employees had been paid a

---

[1] Herein called the Company.

[2] 52 Stat. 1060, 29 U.S.C.A. § 201 et seq.

monthly salary. In each case when the original contracts were executed, the weekly guarantee represented the weekly proportional part of the prior monthly salary. The contracts themselves clearly indicated that by the execution thereof, the company intended to pay these employees the same wages that were paid prior to the execution thereof.

In his complaint, the Administrator charged the following violations of the Act: That the company had failed to keep the records required by the regulation; that it had violated the provisions of the Act by working its employees longer than 40 hours a week without compensating them for such overtime at a rate of not less than one and one-half times the regular rate of pay; and that it was violating the provisions of the Act prohibiting the shipping of goods in interstate commerce which had been produced by employees employed in violation of the minimum wage and maximum hour provisions of the Act.

The trial court made findings of fact and conclusions of law. It found contrary to the contention of the company that Cynthia Davenport was an employee within the provisions of the Act and that as to her the company was not keeping the records contemplated by the Act and required by the regulations. It found that the contract hourly rate of compensation was the true rate and that the minimum weekly guarantee was, under the contract, intended as compensation for the maximum hours of work at the regular rate and time and one-half for all overtime hours which it was contemplated the employees would work in excess of the maximum regular hours. Based on these findings, the court concluded as a matter of law that the contracts in question were bona fide agreements governing the wages of the employees in question and were in full compliance with the requirements of the Act, but as to Cynthia Davenport, the company had violated the Act by not keeping the required records as to her hourly rate of compensation and as to the number of hours worked. Based upon these findings and conclusions, the court entered a decree enjoining the Company from failing to keep appropriate records as to Cynthia Davenport but denying

an injunction in all other respects. The Administrator has appealed from that part of the final judgment denying an injunction restraining the company from violations of Sections 7(a) (2), 7(a) (3), 11(c), 15(a) (2), 15(a) (5) of the Act. No cross appeal was taken by the company from that part of the decree enjoining it from violating the provisions of the Act relating to the keeping of records in the case of Cynthia Davenport.

The trial court, in its memorandum opinion, devotes considerable discussion to its equitable discretionary powers under the decisions of the Hecht case, and other similar cases (Hecht Co v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754), to refuse to enter an injunction in such cases as this, although violations of the provisions of the Act are established where such violations have ceased or there is reasonable grounds to believe that they will not continue. This discussion is in connection with a prayer for an injunction because proper records were not being kept. At the time of the trial, proper records were being kept in all of the cases except in the case of Cynthia Davenport. The court enjoined the company from continued violations in this respect in her case, but denied the injunction as to such prior violations as had ceased at the time of the trial. The trial court did not abuse its discretion in this matter. The court was also of the view that if violations of the minimum wage and maximum hour provisions of the Act had occurred, the execution of the contracts brought the company in compliance with these provisions, and, therefore, the court felt it should not enjoin such prior violations, if any. In view of the conclusions we have reached as to the validity of the contracts as will appear hereinafter, nothing needs be said here on this position of the court.

■ It is not always easy to determine whether a specific contract meets the requirements of the Act. Congress had two thoughts in mind in passing the Fair Labor Standards Act. It sought to raise substandard wages and to lessen unemployment by shortening hours and spreading available work among a greater number of workers. It accomplished the first objective by the mandatory provisions of the Act

as to the minimum wages which could lawfully be paid. It sought to accomplish the second objective by way of persuasion or inducement to the employer to reduce hours of employment, and if he refused to do so, by providing additional compensation for the overtime which employees were required to work. To induce the employer to reduce the hours in the workweek, the Act provides for a regular rate of pay for the maximum regular workweek and for time and one-half of such regular rate for all hours of work in excess thereof.[3]

The Act does not contemplate a single rigid form of wage contract. Neither does it outlaw an employer-employee wage agreement merely because it provides for the same wage that was paid prior to the effective date of the Act, so long as the hourly rate actually used equals or exceeds the minimum requirements of the Act, and so long as it provides for at least one and one-half the regular hourly rate for all overtime hours.[4] So also the Act does not proscribe a contract which provides for weekly guarantees which may not exactly measure the sum due, computed at the hourly rate plus time and one-half thereof for all overtime hours, so long as the weekly guarantee bears reasonable relation to the wages which it is contemplated the workers will earn under the hourly rate in the contract. Within this general framework, the parties are free to contract as they wish. The sufficiency of every contract must be tested by these general principles.

In Walling v. Belo,[5] the Supreme Court upheld a contract which, so far as the terms employed were concerned, was much like the contracts in question. This contract has become known as "The Belo Contract," and all similar contracts are referred to as "Belo Type Contracts." It is well established that the Belo Type Contract is valid under the decisions of the Supreme Court. The Trial Court's conclusion of law that the contracts in question were valid is based on its conclusion that these contracts were Belo Type Contracts.

In the Belo case, the Supreme Court considered a contract and employment situation much like the one in this case. The employees there, as here, were working irregular hours. They had been paid a monthly salary prior to the effective date of the Act. The intent of the parties was to pay the same wages under the contract as were paid before. The contract fixed an hourly rate for maximum regular hours per week and provided for payment of one and one-half times the regular rate for all overtime hours. It also guaranteed a weekly payment irrespective of the number of hours actually worked. The Government's objection to the Belo contract was that the hourly rate and the provision for time and one-half for overtime based thereon were fictitious and bore no reasonable relation to the weekly guarantee, and that, therefore, the weekly guarantee constituted the actual wage and the hourly rate had to be determined from the weekly guarantee under the rule laid down in the Overnight Motor Company case.[6]

This contention by the Government was rejected by the Supreme Court in the Belo case. The court held that the hourly rate was the true rate and that the weekly guarantee was intended to measure the compensation of the employees fixed in the contract, both regular and overtime compensation, and that the guarantee bore a rea-

---

3 Overnight Motor Co. v. Missel, 316 U. S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682; Walling v. Helmerich & Payne, 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29; Jewell Ridge Coal Corp. v. Local No. 6167, 325 U.S. 161, 65 S.Ct. 1063, 89 L.Ed. 1534; Southland Gasoline Co. v. Bayley, 319 U.S. 44, 63 S.Ct. 917, 87 L.Ed. 1244; Walling v. Hardwood Co., 325 U.S. 419, 65 S.Ct. 1242, 89 L.Ed. 1705; United States v. Rosenwasser, 323 U.S. 360, 65 S.Ct. 295, 89 L.Ed. 301; United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; Mid-Continent Pipeline Co. v. Hargrave, 10 Cir., 129 F.

2d 655; Bumpus v. Continental Baking Co., 6 Cir., 124 F.2d 549, 140 A.L.R. 1258.

4 Walling v. Belo Corp., 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716; 149 Madison Ave. Corp. v. Asselta, 331 U.S. 199, 67 S.Ct. 1178; Walling v. Halliburton Oil Well Cementing Co., 331 U.S. 17, 67 S.Ct. 1056.

5 See Walling v. Belo Corp., 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716.

6 See Overnight Motor Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682.

sonable relation to the hourly contract rate. The court did lay down the principle that there must be a reasonable relation between the weekly guarantee and the hourly rate under the contract.

In Walling v. Hardwood Co., 325 U.S. 419, 65 S.Ct. 1242, 1245, 89 L.Ed. 1705, the Supreme Court struck down a contract which established a regular hourly rate and time and one-half for overtime work, and also contained weekly minimum guarantee provisions on the ground that there was such disparity between the hourly rate plus time and one-half for overtime and the weekly guarantee that the parties could not consistently have intended the two to exist together. Speaking of the freedom of contract, the court said, " 'But this freedom of contract does not include the right to compute the regular rate in a wholly unrealistic and artificial manner so as to negate the statutory purposes.' * * * The regular rate by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments. It is not an arbitrary label chosen by the parties; it is an actual fact." The court reaffirmed the decision in the Belo case but stated that it was " * * * no authority, however, for the proposition that the regular rate may be fixed by contract at a point completely unrelated to the payments actually and normally received each week by the employees."

In Walling v. Halliburton, Oil Well Cementing Co., 331 U.S. 17, 67 S.Ct. 1056, 1059, the Supreme Court considered and upheld another Belo Type Contract. In this case, the employees worked irregular hours and were originally paid a fixed monthly salary. After the effective date of the Act, written contracts were executed which provided for a regular hourly rate and time and one-half for overtime, together with a weekly guarantee. It was again contended that the weekly guarantee bore no reasonable relation to the hourly rate, and that, therefore, the guarantee measured the true hourly rate and the contract rate was fictitious. In support of this, it was urged that before more than the guarantee could be earned, an employee would be required to work at least 84 hours per week. The court notwithstanding held that the hourly rate was the true rate and that there was a reasonable relation between the guarantee and the contract rate. In reaching this conclusion, the court pointed to the fact that in about 20% of the workweeks employees actually did work in excess of 84 hours and were paid compensation in addition to the weekly guarantee. In again discussing the Belo case, the court said, "In Belo itself, the specified basic hourly rate was held to be the actual regular rate because, as to weeks in which employees worked more than 54½ hours, the specified rate determined the amount of compensation actually payable."

We deem it unnecessary to discuss such cases as Overnight Motor Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682; Walling v. Helmerich & Payne, 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29; 149 Madison Avenue Corp. v. Asselta, 331 U.S. 199, 67 S. Ct. 1178. In these cases, the hourly contract rate was stricken down on the ground that the formula for determining the hourly regular rate was artificial and unreal so as not to form a proper standard of measuring such rate.

From an analysis of these cases, we conclude that the correct rule to apply is that where employees work irregular hours under a contract fixing a regular hourly rate and providing time and one-half for overtime and also for a weekly guarantee, the hourly rate must have been intended to determine the weekly wages which it was contemplated would be paid for both regular and for overtime work, at not less than one and one-half times the amount thereof; and that the weekly guarantee must be such a sum as the parties contemplated would ordinarily result from the application of the hourly rate to the regular and overtime hours, taking into consideration that the hours of work were not fixed and that they varied somewhat from week to week. If the hourly rate fixed in the contract was such that it did not reasonably determine the weekly wages intended to be paid to the employees, according to the nature of their employment, for both regular hours and one and one-half times such hourly rate for the overtime hours for such hours as they would ordinarily work, it would be a ficti-

tious rate. In such a case, the weekly guarantee would constitute the real wage and would be used in computing and determining the hourly rate.

■ Thus considered, we conclude that the trial court erred in its conclusion of law as to the validity of these contracts and as to the judgment entered thereon. The validity of a contract must in each instance be determined from the facts and circumstances in that case. Other cases can be of help only as they point the way and lay down general principles. While in general the terms of the contracts in this case are the same as those in the Belo case, there are certain facts which distinguish the two contracts. Thus, when employees received an increase of pay in the Belo case, the hourly rate and the weekly rate of the contract were readjusted. In other words, the contract was rewritten to reflect the new condition. Thus the new hourly rate always bore a reasonable relationship to the weekly pay. In the Belo case, at least 10% of the employees actually received overtime payment for additional hours worked in addition to the guarantee in the contract.

In the Halliburton case, the court also found that, while in order to earn more than the guaranteed wage the employees were required to work more than 84 hours per week, actually in about 20% of the workweeks they did work in excess of 84 hours for which they received additional overtime pay in addition to the guarantee in the contract. Here a number of increases were given, expressed in terms of a monthly raise. Using the Loose case as a representative example, under his original contract, his wages were increased from $100 to $125, and then to $140. No change, was however, made in the contract either as to the hourly rate or as to the weekly guarantee. Under his 1944 contract, Loose also received, as did the other employees, wage increases. His increases were from $140 to $175, $192.50, and finally to $215. All of the other employees also received additional increases. In all of the cases, no change was made in the hourly contract rate or in the weekly guarantee provided for therein. In each instance the employee was informed orally that his wages had been increased. Prior to August, 1944, the company did not keep a record of the hours worked by these employees. This would indicate that no significance was attached to the number of hours which the employees were required to work. The hourly rate expressed in the contract could have no significance unless an accurate account was kept of the number of hours actually worked. The fact that no such records were kept would indicate that the company attached no significance whatever to the contracts or to the hourly rate or to the provision in the contract for one and one-half times such hourly rate for hours in excess of the maximum permitted by the Act, and that it considered the monthly salary as the true wage. So also it further appears in this case that in not a single instance was overtime payment paid in addition to the weekly guarantee provided for in the contract or the sum representing the semi-monthly salary of the employee.

The company takes the position that the periodic increases in salary, in effect, constituted an increase in the guaranteed weekly wage under the contract. It is not necessary to decide whether this assumption is supported by the record, because, if so, it would only tend to accentuate the unreality between the weekly guarantee and the hourly rate, and would go to show more clearly that the hourly rate in the contract was fictitious and that the weekly guarantee was considered as the true weekly wage. Thus, if the hourly rate of 30 cents in Loose's original contract can be said to reasonably measure the contemplated monthly salary as reflected in the original weekly guarantee of $23.08, it cannot be said that it likewise would have reasonable relation to a weekly guarantee of $32.30 [7] in the absence of a contemplated increase in the weekly hours of work, and there is no evidence that the employees did or were expected to increase the hours of work as they received these periodic increases in salary. The same would be true under Loose's 1944 contract which fixed an hourly rate at all times of 40 cents and a weekly guarantee of $32.30, and under

---

[7] The $32.30 is the weekly proportional part of the monthly salary of $140 which Loose ultimately received under his original contract.

which thereafter he received monthly wage increases to $175, $192.50, and finally to $215, without any change in the hourly contract rate.

■ This all leads to the inescapable conclusion that the hourly rate of the contract was not the real rate of pay, that it was fictitious, and that it was not intended to measure the wages the employees were intended to receive and was not considered significant in determining the amount to pay to which an employee was entitled for regular hours and overtime hours of work. The Administrator was entitled to an injunction restraining the enforcement of the contract and the shipment of goods in commerce in violation of the provisions of the Act. Reversed and remanded with directions to proceed in conformity with the views expressed herein.