Lawrence A. PEZZILLO et al.

v.

GENERAL TELEPHONE AND ELEC-
TRONICS INFORMATION SYSTEMS,
INCORPORATED, a New York corpora-
tion, with its principal office in New
York City.

No. 74–236–NA–CV.

United States District Court,
M. D. Tennessee,
Nashville Division.

Jan. 15, 1976.

As Modified March 5, 1976.

**1258**

F. Clay Bailey, Jr., Dearborn & Ewing, Nashville, Tenn., for plaintiffs.

William N. Ozier, Bass, Berry & Sims, Nashville, Tenn., Jay M. Rosen, Stamford, Conn., Gen. Counsel, GTE Information Systems, Inc., for defendant.

## MEMORANDUM

### Findings of Fact

MORTON, District Judge.

1. This action was brought by ten former salaried employees of the defendant under the provisions of the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.,* hereinafter referred to as "the Act," alleging that the defendant knowingly and willfully violated Section 7 of the Act (29 U.S.C. § 207) by failing to compensate them for work in excess of 40 hours per week at one and one-half times their normal hourly rate. Plaintiffs seek the amount of overtime payments due plus an equal amount as liquidated damages and reasonable attorney fees.

2. The defendant GTE Information Systems, Inc., Programming Methods Division (hereinafter referred to as "defendant" or "PMI") is a Delaware Corporation with its principal office located in Stamford, Connecticut. The parties have stipulated that the defendant is an employer within the meaning of Section 3(d) of the Act, and is an enterprise engaged in commerce within the meaning of Section 3(f) of the Act.

The defendant is a division of General Telephone and Electronics, Inc. and was, prior to its acquisition by said corporation in 1972, known as P.M.I. (Programming Methods, Inc.).

3. The defendant offers consulting and implementation of data processing services on a contractual basis. Its operation is nationwide with its central office located in New York City. It employs approximately 1,100 persons. The plaintiffs were employed by the defendant to implement computer systems for certain customers according to specifications. They were referred to by the defendant variously as programmer analysts, programmers, and members of technical staff. The overtime violations complained of by the plaintiffs occurred in Miami, Florida, during the years 1972 and 1973 while the plaintiffs were working on three contracts for defendant (viz., Ryder Truck Rental, General Development Corporation of Miami, Florida, and Dade County, Florida).

4. The individual plaintiffs were employed by the defendant for the periods indicated below in connection with the performance of the three jobs in Miami, Florida:

(a) Lawrence A. Pezzillo—1/10/72 to 9/19/74

(b) Ronald Ray—10/3/72 to 7/26/74

(c) Thomas Kos—6/12/72 to 2/15/75

(d) James Matheson—6/11/73 to 5/22/74

(e) Thomas Papalski—9/11/72 to 2/28/74

(f) Stanley Walters—6/1/73 to 2/6/74

(g) James Schweizer—7/30/73 to 12/21/73

(h) Jerry Harness—8/2/72 to 2/28/74

(i) Mark S. Cotter—5/14/73 to 4/8/74

Each of the plaintiffs was employed by the defendant on a salary basis at the amounts set forth below:

| | Plaintiff | Starting Rate | Rate at Termination |
|---|---|---|---|
| (a) | Pezzillo | $11,640 | $12,640 |
| (b) | Ray | 10,500 | 11,500 |
| (c) | Kos | 11,800 | 12,900 |
| (d) | Matheson | 9,000 | 9,500 |
| (e) | Papalski | 12,100 | 13,900 |
| (f) | Walters | 11,500 | 11,500 |
| (g) | Schweizer | 10,500 | 10,500 |
| (h) | Harness | 12,500 | 14,000 |
| (i) | Cotter | 12,500 | 12,500 |

5. The parties, through their attorneys, have agreed that if defendant is found to be in violation of the Act, the hours worked and hourly rates of the plaintiffs will be stipulated on the basis of the records kept by the parties, and overtime payments will be computed and stipulated.

6. The issues to be decided by the court are whether the work performed by the plaintiffs exempted them from coverage as administrative employees under 29 U.S.C. § 213(a)(1), and whether the defendant in good faith failed to pay the plaintiffs overtime (29 U.S.C. § 259).

7. For the purpose of this litigation, the following descriptions will be helpful:

A computer is a machine with no intelligence and has no independent stimuli. It must be instructed in minute detail as to every activity which it is requested to perform. Each computer is manufactured to accept only specified language, one of which is known as "cobol" (common business oriented language). Through the use of the binary principal, symbols made up of combinations of the figures 0 and 1 are arbitrarily assigned to denote words, numerals, phrases and processes.

By the use of electronic impulses, activated by a device similar to a typewriter, language can be fed into the computer and placed on storage units (magnetic tapes or magnetic disks). On command, by use of the built-in language, the information stored can be selectively combined to produce a defined result, i. e., complete bookkeeping systems, leasing systems, information storage banks, etc.

To accomplish the desired result, a person with knowledge of the computer's capability must design a system for the particular information to be put into the machine, prescribe certain manipulations, and specify the desired result. This requires considerable expertise, discretion, and independent judgment free from immediate direction or supervision.

Once the designer, sometimes called an analyst, determines the system, he usually describes this system in narrative form,[1] commonly referred to as a program narrative or specifications. To further complicate the matter, there is ordinarily an overall system with numerous subsystems. At this point, there exists input of known information, a designation of certain computations or operations, and a desired result narrated by the designer. The next step is to translate the narrative, which is in the English language, into computer language.[2] This portion of the project is referred to as programming. The programmer writes in computer language the commands to the computer to implement the narrative.[3] These commands, once translated into computer language, can be stored on punch cards, the use of which avoids necessity of typing the entire process on each use of the computer.

Once the programming is completed, the system must be tested to determine if the design is effective and has been effectively implemented.

In fact, the program is run through the computer using known sample material or with data which will produce a known result.

The testing is generally called "debugging." The most common errors arise by reason of improper syntax, human errors in detailing the command steps, and logic in

1. A narrative has been defined as a running account of the logical operations occurring in any segment of a program.

2. Computer language might be compared to any foreign language.

3. To illustrate:
   Assume one were instructing a baby to eat from a bowl. Instead of placing a spoon in the hand of the baby and demonstrating, through performance, the dipping of the spoon into the bowl, carrying it to the mouth and depositing its contents into the mouth, the instructions to a computer would be more detailed. The possible commands might be:
   (1) Raise your right arm to table height

   (2) Move your right hand forward 8″
   (3) Place your right hand on the spoon
   (4) Curl your fingers around the spoon
   (5) Raise your right arm 4″
   (6) Move your right arm 4″ to the left
   (7) Lower your right arm 4″
   (8) Tilt the spoon forward 30°
   (9) Move the spoon forward 1″
   (10) Tilt the spoon upward 30°
   (11) Raise your right arm upward 14″
   (12) Turn the spoon horizontally 180°
   (13) Move your right arm 4″ and simultaneously open your mouth
   (14) Rotate the spoon 180°
   (15) Move the spoon outward 4″ and return it to the original position.

design. The correction of syntax and other human errors are discovered by reexamination of the computer command language previously written by the programmer. If there is a defect in the design of the system, the designer must reexamine the design and make the appropriate changes. Of interest is the fact that a programmer does not need the expertise of the designer, need not know the innerworkings of the computer, and can do adequate work with only a general familiarity of its function and a grasp of computer language.

### 8. *The Ryder Contract*

Ryder Truck Rental decided to change from its computer system to a new data processing system utilizing an IBM 370 computer. It contracted with defendant to furnish certain personnel designated as experienced commercial programmers. One of defendant's vice presidents described the defendant's function as:

> Basically at Ryder we were working in a support capacity with Ryder and IBM and assisting them to go to an on-line third generation computer system.

A complete new system was being established. The design and specifications (program narrative) were developed by analysts employed by Ryder. No specifications were developed by defendant's employees. The specifications were written and the programmer translated the specifications into computer language. The programmer could make suggestions as to possible ways of improving the system. However, any proposed improvements were required to be approved by a Ryder analyst. If problems in design were encountered in the program through testing or otherwise, a Ryder analyst would advise defendant's employees as to what was wrong and how to remedy the problem.

### 9. *General Development Computer Contracts*

There were two separate phases of work under these contracts.

The first involved the Univac operation at GDC. Certain systems were used in operating the Univac computer. The analyst at GDC had designed and written a narrative of the programs in use. The defendant, through its personnel, was to check the narrative with the programs in use to ascertain if the narrative was accurate. If the narrative omitted any step actually in use, this step was to be narrated and placed in proper sequence.

The second phase of the work was to convert existing Univac and Honeywell computer systems to an IBM 370/145 system.

Each system had its own language (foreign). These systems were designed and programmed before defendant's employees came on the scene. GDC employees were more experienced and knowledgeable about those systems than were defendant's personnel. The primary function performed by defendant was the translation of the computer language of Univac and Honeywell to cobol, the language used by IBM in IBM 370/145. Thereafter, the translated programs, with adjustments to accommodate the particular peculiarities of the IBM computer, were tested and debugged by defendant's employees.

The project leader on the job (now director of projects) described the GDC project as follows:

A. There were two projects on the General Development job, the Univac and Honeywell conversions.

Q. All right.

A. The Univac system had specifications which included a narrative and flow chart and a Univac program listing. The programmer was given that package, and his job was to write a Cobol program which would give the same answers.

Q. All right, sir. Was the program listing from the Univac system written in machine language, the Univac language?

A. Yes, sir, it was written in a language called PAL.

Q. That's not the same as Cobol or English language?

A. There's a big difference.

Q. All right, and what kind of language were they given on the Honeywell conversion?

A. The Honeywell was a little bit easier in that we were converting Cobol programs on the Honeywell to Cobol programs on IBM. There was a documentation package prepared that showed the input and output files coming into the program, and if I remember right, there was some sort of brief narrative about what the program did.

Q. Mr. Riley, in developing a new program on the Univac conversion, was there any analytical process required of the programmer?

A. I'm sorry?

Q. Was any analytical process required of the programmer in developing new programs from the old Univac programs?

A. He would have to understand what the program was supposed to do by examining the specifications, yes.

[Testimony of Dennis Riley]

10. *Dade County, Florida, Contract*

The Dade County contract was described by the defendant's project leader as follows:

Q. All right, sir. Now, what was involved in the Dade County job?

A. The Dade County job involved taking the current, a current criminal justice system and converting that from an antiquated teleprocessing monitor that it ran under to a PMI soft ware package called intercom.

Q. What were the programmers on that job given to work from to develop the new programs?

A. As far as I remember, the only documentation they received was the actual program listing of the current system, plus manuals on intercom, and, I believe, there was a—I'm not really sure whether they attended an intercom class or not. They did receive some instructions from PMI personnel who worked with intercom.

Q. And, basically, what were the requirements of the job on Dade County, what were the programmers actually doing?

A. They were taking specific programs, locating the areas in those programs that dealt primarily with the input and output files and input and output messages, extracting all of that information and replacing it with the requirements of intercom.

Q. Was that purely a mechanical process, eliminating the old steps and putting in new ones?

A. It wasn't totally mechanical. There was a lot of mechanical work involved, I guess.

Q. All right, sir, was there some other work involved that was not mechanical?

A. Yes, sir.

Q. What was that?

A. Understanding what the programs were supposed to do, whether they functioned correctly in the current state and cases where they didn't.

[Testimony of Dennis Riley]

One of the plaintiffs gave the following information:

Q. You had the program listing—did you have sample output?

A. Yes, we did.

Q. Was the output supposed to match the existing output?

A. Yes, it was. No—we were given, in some cases we were given new formats to program.

Q. I see, and you had to come up with a program to develop the new format or the new output?

A. The new—a new display screen, yes, sir.

Q. Rather than making a print-out, you were working on a system that displayed on a video display terminal, is that correct?

A. That's right.

Q. Where it shows up on a little tube, I think they call it sometimes?

A. Right.

Q. Mr. Cotter, did you also have to, as a result of this conversion to the intercom system, come up with new data selection or new input to the system?

A. No new input, no.

Q. So, the input was the same?

A. Yes.

Q. All right, sir, were the calls to the data system different because of the intercom system?

A. Yes, that was the—that was what was changed.

Q. That's basically what you were doing?

A. Yes.

Q. A different instruction went to the computer to select the same data?

A. Yes.

Q. When you were required to come up with new output, did you have to come up with new logic for the program to make it come up with the new output?

A. In some cases we had to add small amounts of logic to be compatible with intercom.

Q. I see. And did someone give you that logic or was that a result of your own work?

A. That was taught in the beginning, how we would handle that, and then we programmed it in.

Q. All right. So, as far as actually working on the program, you came up with the new logic yourself?

A. No, the logic was given to us and we applied it to the programs.

Q. I see. It was given to you in the classroom type instruction?

A. Yes.

Q. Who taught that instruction?

A. John Butts.

[Testimony of Mark Steven Cotter]

11. The plaintiffs were designated in the personnel records of the defendants as holding positions on the "Tech Staff." In this capacity, certain of them have received evaluations as to ability which are particularly noteworthy:

Matheson, Jas K. Unable to perform in a technical capacity required by PMI

Brief Evaluation of Employees Ability —Very, very little

Walters, Stanly J Good Programmer

Schweizer, James Reasonable Programmer

Ray, Ronald Starting date—10/3/72 Ron started with PMI with very little experience. Over the past year he has learned a great deal and can now stand on his own in coding and completing programs. He is dependable and tries his utmost to do a good job. His technical ability is limited but does ask for help when he needs it and learns when shown something

Harness, Jerry Competent Cobol programmer

Kos, Thomas Tom is a good Cobol programmer. He has been doing a good job since he has been with the company. At present he shows no signs of wanting or having the ability to advance beyond the programming/analysis stage.

Pezzillo, Lawrence Larry is at best an average programmer. He is careless in the work he does and does not spend the time required to write and complete a good program. . . .

12. The project leader employed by the defendant gave the following testimony:

Q. All right, Mr. Riley, when the programmer is given a specification, is he required to develop the logic for his program from the specification or is that already done for him?

A. By logic, if you mean flow chart, some kind of system that the programmer may have of his own to break down the actual specification, yes, he is.

Q. All right, sir, even if the programmer. . . .

BY THE COURT: Now, wait just a minute, now wait just a minute. The specifications, as I understand it, detail what you expect the programmer to do?

A. Yes, they do.

BY THE COURT: And you are talking— and a flow chart then you are saying is something that the programmer does just

to draw himself a kinetic picture rather than a mental picture, is that what you are saying?

A. That's right, he's talking a narrative and drawing a picture from that.

BY THE COURT: And that is for his own benefit?

A. Either for his own benefit or at times it becomes part of the documentation of the system.

BY THE COURT: But that's a matter of convenience as far as the programmer is concerned or is that a requirement?

A. It will vary depending on the organization we work for. There are some places that it is required.

BY THE COURT: So, what he is doing is transforming or translating from the specification a visual chart?

A. Yes, sir.

BY THE COURT: Isn't that mechanical?

A. The drawing of the chart is mechanical.

BY THE COURT: Well, the transferring, it says you go from A to B, so he puts A to B on a chart. Do not the specifications detail how it goes?

A. The specifications could say go from A to B, but they could say go from A to Z which may involve going through the entire program, depending on the level of detail in the specification.

BY THE COURT: What I'm saying is I am having a little problem on this matter as to whether or not it is mechanical or not mechanical. When you have a specification to say we are going to start at point A and we are going to wind up at point Z and we are going to go from point A to point Z through New York and back to New Jersey and down to Washington and back up to New Jersey and back to Washington and then down to Z. Now, that's all spelled out in the specifications, is it not?

A. If you take the specification that was introduced Friday and you look at it, that's a very detailed specification, and it's very— it's a mechanical process.

BY THE COURT: All right.

A. Not all specifications are that detailed.

BY THE COURT: All right, now, then, do you—are those specifications that say, "We are going from A to Z, and we are not going to tell you anything about how to get there; you are just going to have to get there the best way you can"?

A. That's right.

BY THE COURT: And you turn those over to programmers and not to analysts?

A. Programmers receive them, yes.

BY THE COURT: I beg your pardon?

A. Yes, they are turned over to programmers.

BY THE COURT: And you expect programmers to do the coding and programmers do, they work out the method of getting from A to Z?

A. By whatever means they can.

BY THE COURT: By whatever means they can.

Then they determine whether to go from New Jersey to Washington, back to New Jersey and down to Philadelphia and back—

A. Yes, sir.

BY THE COURT: —by the calls they put in the instructions they put in the computer, is that what you are saying?

A. Yes.

BY THE COURT: Well, then why do you need an analyst?

A. The analyst determines. . . .

BY THE COURT: Because the company can say I want to go from A to Z. Why do they need you?

A. The analyst was the one that determined that you wanted to go from A to Z.

\* \* \* \* \* \*

A. I would say Mr. Kos and Mr. Pezzillo performed some analysis work.

Q. What did they do, systems analyst work?

A. Pardon?

Q. Systems analyst work?

A.   Yes.

Q.   Wherein did they perform any?

A.   Mr. Pezzillo worked on the accounts payable system and assisted Mr. Vajda and Mr. Van in designing part of that system.

Q.   All right, now, did they—weren't they given programs, the specifications for programs prepared by Mr. Vajda and the systems analyst at Ryder?

A.   Yes, they did, they were.

Q.   Well, they were given those program specifications for programs to work on, is that right?

A.   Yes, they were.

Q.   They did not prepare those specifications, did they?

A.   No, they didn't.

Q.   Well, wherein did they design these specifications, that is what a systems analyst does, is it not?

A.   It is part of what he does.  I would say after they received the specifications and wrote some of the programs involved in that system, there were some problems in the system, and they assisted Mr. Van and Mr. Vajda in making corrections to that system.

Q.   Well, they went to them and consulted with them about problems they found?

A.   Yes, they did.

Q.   They didn't advise Mr. Vajda how to change the system, did they?

A.   I would think they did to a minor degree.

Q.   Well, to a minor degree.  Well, primarily they were coding and debugging, isn't that right?

A.   That was their primary function, yes.

BY THE COURT:  Mr.—let me ask this witness a question.  Do you know anything about the construction business at all?

A.   No, sir, I don't.

BY THE COURT:  Well, normally an architect designs a building and he designs the stress.  He draws up sections of it.  He puts in the streets, mathematical computations.  He outlines where the—he outlines basically the type of bathrooms he wants and what have you, and then he turns it over to a draftsman, and the draftsman draws all of the pretty lines, and then he checks out the mathematical computations, and he calls up the architect and says, "Wait a minute, you've made a bust here on the mathematical computations;  you added two and two together and got six, so the stress is off";  and then he counts up the number of square feet in the building and says, "Well, wait a minute, the building code says you have to have so many extra bathrooms";  and then he looks at the use of the building and looks at the number of outside lights in the building, outside windows, and he says, "The building code says you have to have so many square feet of windows for so many square feet of building", and he says, "You made a bust on this one.  What are we going to do about it?"

The architect says, "You make it conform."

A draftsman is mechanical, he's covered by the Wage and Hour, even though he uses his mind, even though he points out where an architect makes mistakes, he points out where the professional blew it.

Now, then, what is the difference between what I have told you about a draftsman and what these gentlemen did here about your problem?

A.   They are similar in that they were given the original outline.

BY THE COURT:  And checked up and found out somebody blew it.

A.   Yeah.

BY THE COURT:  They said, "Look, you blew it."

A.   Yes.

BY THE COURT:  "And, therefore, since you have blown it, don't you think we had better do something about it?"

A.   Yes, and recommend what to do about it.

BY THE COURT:  Well, the draftsman said, "We will put more skylights in or we will put more bathrooms in or we will put

more outer doors in to comply with the fire code."

Is that what your man does? He said, "If this monster is going to work, we need another step."

A. It's sort of similar, yes.

[Testimony of Dennis Riley]

13. It is generally conceded that the writing of the command orders (translating the narrative from English into computer language—sometimes referred to as decoding) is a mechanical process and as a general rule comprises approximately 20% of a programmer's time in implementing a program. The other approximately 80% is spent in debugging, i. e., discovering and correcting syntax and human errors in translating the narrative to code plus discovering design errors, calling them to the attention of the analyst, and thereafter, at his direction, correcting them. No evidence appears in this record as to what portion of the 80% is normally expended in discovering syntax and human error in the direct translation of the narrative (specifications) to computer language. These are mechanical errors and their discovery and correction are mechanical and nondiscretionary.

14. After the hearing, the defendant introduced the deposition of Dr. William H. Rowan, Jr., a Professor of Systems and Information Science at Vanderbilt University, who testified as an expert in the field of computer sciences. Dr. Rowan, aside from his academic duties, owns a firm which provides data processing services for clients. His firm employs programmers who code and debug and are not paid overtime. Dr. Rowan stated that in his opinion a programmer was not analogous to a draftsman working for an architect, but was instead more like an engineer working as a professional with the architect on the structural aspect of a building. Dr. Rowan considers programmers to be professionals. His explanation for Mr. Vajda's analogy between architect and draftsman and systems analyst and programmer was that Mr. Vajda probably didn't know what an architect did. He finally admitted that architects and engineers were both professionals

who used draftsmen to implement their plans and that here his analogy broke down. His opinions are rejected.

15. The defendant contends that its failure to pay overtime to the plaintiffs was based on its good faith belief that they were exempt from coverage. The only live witness from the defendant was Mr. Dennis Riley. He took orders from Mr. Donald Toy in New York, who had general management of the company in the Eastern United States and from Mr. George Langnas, President of the defendant. Mr. Riley had no connection with the Wage and Hour policy of the defendant and had never had any discussion with Mr. Toy as to whether any employees of the company should be paid overtime. The only explanation Mr. Riley could offer as to why the plaintiffs were not compensated for overtime was that he did not know of anyone else in the industry who paid overtime.

The defendant also offered the statement of a representative of the data processing industry submitted at a public hearing in February, 1971, held by the Wage and Hour Division to determine the status of, among others, programmers under the professional, executive administrative exemption (29 U.S.C. § 260). It was stated that the purpose of this exhibit was to show that the defendant followed in good faith the position of the industry contained in the statement that programmers were exempt from coverage as professional or administrative personnel. It is significant that as a result of the public hearing the Wage and Hour Division determined in December, 1971, that programmers and systems analysts were not professionals (38 C.F.R. § 541.-302(h); Fed.Reg. Vol. 36, No. 232, Dec. 2, 1971). It gave as examples of the activities of programmers not requiring the degree of discretion and independent judgment to classify them as administrative, the preparation of flow charts, the preparation of instructions to the operator and debugging the program (38 C.F.R. § 541.207(c)(7)). It is material that the regulations specifically pointed out that the determination of the exemption of programmers as administra-

tive employees is a factual determination. Neither Mr. Toy nor Mr. Langnas, who determined the defendant's personnel and wage policies, appeared as witnesses. Mr. Toy, in his deposition, indicated a familiarity with Wage & Hour regulations. Mr. Toy was not conscious of the defendant ever having received, or having sought, a legal opinion, an administrative determination, or any advice as to the status of its employees relative to the overtime provisions of the Act. The defendant knew that the work of its employees consisted of coding, debugging, preparing flow charts and instructions.

16. Mr. Riley had no responsibility for determining whether the plaintiffs or other employees of the defendant would receive overtime or be treated as exempt from the Act. Neither Mr. Toy, the general manager of the division of the defendant's business in which Mr. Riley and the plaintiffs worked, nor Mr. Langnas, President of the defendant, were offered as witnesses. There is evidence in the record that some other companies did not pay programmers overtime, but there is no credible evidence whatever that the defendant relied on this fact or any other reason in failing to pay the plaintiffs overtime as required by the Act.

17. The defendant has therefore failed to offer any proof that it had a good faith belief based on reasonable grounds which motivated its failure to pay overtime. It is obvious that the data processing industry has attempted and is attempting to convince the Wage and Hour personnel that computer programmers as a group are exempt from the provisions of the Fair Labor Standards Act. The industry has not been successful. Certain regulations, *infra,* spell out the ground rules. However, it appears that defendants have decided to run the risk of detection and to assert that there is enough ambiguity to justify a good faith defense on detection. This court does not agree.

Mr. Riley's testimony, hereinbefore quoted, clearly reflects sufficient knowledge by the defendant. With this knowledge the defendant intentionally elected not to comply with the overtime provisions of the Act. This constitutes a willful violation.

18. The court finds that plaintiffs did not perform services as analysts. Furthermore, the greater part of their work was mechanical and involved the use of practical skills (as distinguished from discretion and independent judgment) acquired in the trade. In fact, the plaintiffs in each of the three contracts were presented with systems previously designed by analysts and plaintiffs merely used their skills in placing the programs in the computer. Thus, there was no exercise of discretion and independent judgment as described in the regulations.

### Conclusions of Law

1. The court has jurisdiction of the parties and the subject matter of this cause.

2. The defendant is an enterprise engaged in commerce or in the production of goods for commerce within the meaning of §§ 3(r) and 3(s)(1) of the Act (29 U.S.C. § 201 *et seq.*), and defendant's employees have at all times been employed in an enterprise engaged in commerce and in the production of goods for commerce and are therefore covered by the Act.

3. The exemptions from overtime requirements of the Fair Labor Standards Act are set forth in 29 U.S.C. § 213. The pertinent provision is § 213(a)(1) as follows:

§ 541.2 Administrative.

The term "employee employed in a bona fide * * * administrative * * capacity" in section 13(a)(1) of the act shall mean any employee:

(a) Whose primary duty consists of:

· · ·

(1) The performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers,

\*       \*       \*       \*       \*       \*

(b) Who customarily and regularly exercises discretion and independent judgment; and

\*　　\*　　\*　　\*　　\*　　\*

(2) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge, or

(3) Who executes under only general supervision special assignments and tasks; and

(d) Who does not devote more than 20 percent, \* \* \* of his hours worked in the work-week to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (c) of this section; and

(e)(1) Who is compensated for his services on a salary or fee basis at a rate of not less than $155 per week \* \* \*

4. Regulations have been promulgated defining and implementing 29 U.S.C. § 213. Those pertinent appear in Title 29 of the Code of Federal Regulations and are as follows:

§ 541.206   Primary duty.

(a) The definition of "administrative" exempts only employees who are primarily engaged in the responsible work which is characteristic of employment in a bona fide administrative capacity.   Thus, the employee must have as his primary duty office or nonmanual work directly related to management policies or general business operations of his employer or his employer's customers, \* \* \*

(b) In determining whether an employee's exempt work meet the "primary duty" requirement, the principles explained in § 541.103 in the discussion of "primary duty" under the definition of "executive" are applicable.

§ 541.207   Discretion and independent judgment.

(a) In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered.   The term

as used in the regulations in Subpart A of this part, moreover, implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance.   (Without actually attempting to define the term, the courts have given it this meaning in applying it in particular cases. See, for example, *Walling v. Sterling Ice Co.,* 69 F.Supp. 655, reversed on other grounds, 165 F.(2d) 265 (CCA 10).   See also *Connell v. Delaware Aircraft Industries,* 55 Atl.(2d) 637.)

(b) The term must be applied in the light of all the facts involved in the particular employment situation in which the question arises.   It has been most frequently misunderstood and misapplied by employers and employees in cases involving the following: (1) Confusion between the exercise of discretion and independent judgment, and the use of skill in applying techniques, procedures, or specific standards;   and (2) misapplication of the term to employees making decisions relating to matters of little consequence.

(c) Distinguished from skills and procedures:

(1) Perhaps the most frequent cause of misapplication of the term "discretion and independent judgment" is the failure to distinguish it from the use of skill in various respects.   An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met or whether an object falls into one or another of a number of definite grades, classes, or other categories, with or without the use of testing or measuring devices, is not exercising discretion and independent judgment within the meaning of § 541.2.   This is true even if there is some leeway in reaching a conclusion, as when an acceptable standard includes a range or a tolerance above or below a specific standard.

\*　　\*　　\*　　\*　　\*　　\*

(7) In the data processing field a systems analyst is exercising discretion and independent judgment when he develops methods to process, for example, accounting, inventory, sales, and other business information by using electronic computers. He also exercises discretion and independent judgment when he determines the exact nature of the data processing problem, and structures the problem in a logical manner so that a system to solve the problem and obtain the desired results can be developed. Whether a computer programer is exercising discretion and independent judgment depends on the facts in each particular case. Every problem processed in a computer first must be carefully analyzed so that exact and logical steps for its solution can be worked out. When this preliminary work is done by a computer programer he is exercising discretion and independent judgment. A computer programer would also be using discretion and independent judgment when he determines exactly what information must be used to prepare the necessary documents and by ascertaining the exact form in which the information is to be presented. Examples of work not requiring the level of discretion and judgment contemplated by the regulations are highly technical and mechanical operations such as the preparation of a flow chart or diagram showing the order in which the computer must perform each operation, the preparation of instructions to the console operator who runs the computer or the actual running of the computer by the programer, and the debugging of a program. It is clear that the duties of data processing employees such as tape librarians, keypunch operators, computer operators, junior programers and programer trainees are so closely supervised as to preclude the use of the required discretion and independent judgment.

\* \* \* \* \* \*

§ 541.209 Percentage limitations on nonexempt work.

(a) Under § 541.2(d), an employee will not qualify for exemption as an administrative employee if he devotes more than 20 percent, \* \* \* of his hours worked on the workweek to nonexempt work; that is, to activities which are not directly and closely related to the performance of the work described in § 541.2(a) through (c).

(b) This test is applied on a workweek basis and the percentage of time spent on nonexempt work is computed on the time worked by the employee.

(c) The tolerance for nonexempt work allows the performance of nonexempt manual or nonmanual work within the percentages allowed for all types of nonexempt work.

■ 5. The regulations are valid, binding and have the force of law. *Walling v. Morris,* 155 F.2d 832 (6th Cir. 1946); *Craig v. Far West Engineering Co.,* 265 F.2d 251 (9th Cir. 1959).

■ 6. The employer seeking an exemption pursuant to 29 U.S.C. § 213(a)(1) has the burden of proof:

An employer seeking an exemption from the overtime requirements of the Act under 29 U.S.C. § 213(a)(1) must prove that each employee is entitled to the exemption by plain and unmistakable evidence. *See Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960). Exemptions must be limited to those falling expressly within the statute. *Wirtz v. Lunsford,* 404 F.2d 693, 697 (6th Cir. 1968). Whether employees are exempt from the requirements of the Act is primarily a question of fact. *Walling v. General Industries Co.,* 330 U.S. 545, 550, 67 S.Ct. 883, 91 L.Ed. 1088 (1947).

*Hodgson v. The Klages Coal and Ice Co.,* 435 F.2d 377, 382 (6th Cir. 1970).

■ 7. A class exemption is not established by 29 U.S.C. § 213(a). The employer must show that each employee meets every requirement of the claimed exemption. *Hodgson v. Klages Coal and Ice Co., supra,* and *Mitchell v. Williams,* 420 F.2d 67 (8th Cir. 1969).

■ 8. The defendant employer has failed to carry its burden of proof to estab-

lish that plaintiffs in the work *sub judice* customarily and regularly exercised discretion and independent judgment. On the contrary, the credible evidence clearly establishes that plaintiffs performed work in which they exercised job skill as contrasted to discretion and independent judgment.

■ 9. The defendant employer has failed to carry its burden of proof that plaintiffs met the requirement of 29 C.F.R. § 541.2(d). On the contrary, the credible evidence clearly reflects that more than 20% of the plaintiffs' work time did not fall within the descriptions contained in 29 C.F.R. § 541.2(a) through (c).

■ 10. Pursuant to the provisions of 29 U.S.C. § 216, plaintiffs are entitled to "an additional equal amount as liquidated damages" unless "the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation . . . ." 29 U.S.C. § 260. The employer has the burden of proof to establish the elements of the escape clause. *McClanahon v. Mathews,* 440 F.2d 320 (6th Cir. 1971).

■ As set forth in the findings of fact, *supra,* the employer has not carried this burden and the plaintiffs are entitled to liquidated damages pursuant to § 216.

11. The plaintiffs are entitled to three years unpaid back wages. 29 U.S.C. § 255(a). In *Hodgson v. Hyatt,* 318 F.Supp. 390 (N.D.Fla.1970), the court emphasized that "willful" under § 255

. . . must be construed in the civil sense. It therefore applies to violations which are intentional, knowing or voluntary *as distinguished from accidental* and it is used to characterize conduct marked by careless disregard whether or not one has the right so to act. (emphasis added)

Of interest is the language in the case of *Coleman v. Jiffy June Farms,* 458 F.2d 1139, 1142 (5th Cir. 1972):

The entire legislative history of the 1966 amendments of the FLSA indicates a liberalizing intention on the part of Congress. Requiring employers to have more than awareness of the possible applicability of the FLSA would be inconsistent with that intent. Consequently, we hold that employer's decision to change his employees' rate of pay in violation of FLSA is "wilful" when, as in this case, there is substantial evidence in the record to support a finding that the employer knew or suspected that his actions might violate the FLSA. Stated most simply, we think the test should be: Did the employer know the FLSA was in the picture? In this case, Trainor knew that the FLSA had to be considered when he ceased to comply with the Act and asked his lawyer if it was permissible to do so. We need not consider today whether the three-year statute of limitations applies in a case where the employer ought to have known of the possible applicability of the FLSA but can demonstrate compellingly that in fact he did not.

The evidence in this case and the findings of fact, *supra,* compel the holding that defendant's violation of the Act was willful as within the context of 29 U.S.C. § 255(a), and that the three year statute of limitations applies.

12. The court will determine a reasonable fee for plaintiffs' attorneys at a subsequent hearing. 29 U.S.C. § 216.

The defendant has filed a motion to modify the memorandum opinion of this court filed on January 15, 1976. Two issues are raised in this motion.

(1) The first issue is whether the court's memorandum leaves doubt as to the percentage of work performed by the plaintiffs which could be classified as discretionary or the exercise of independent judgment.

Upon re-reading its memorandum of January 15, the court cannot find any such uncertainty. Nonetheless, the court deems it appropriate to clarify the meaning of the memorandum for defendant's benefit.

The court found and now reiterates that the credible evidence reflects that plaintiffs

used 100% of their time in purely mechanical and highly skilled work not qualifying as the use of discretion or the exercise of independent judgment. The defendant has entirely failed to carry the burden of proof to show that plaintiffs would qualify for any exemption from the Fair Labor Standards Act.

(2) The second issue raised in defendant's motion to modify concerns the assessment of liquidated damages. Defendant insists that liquidated damages should not have been assessed against it, alleging that it met its burden of showing good faith under the Portal to Portal Act, 29 U.S.C. § 260. In support of this allegation, defendant asserts industry practice, unsettled issue of law, pay level of plaintiffs, and regulations characterizing the issue of exemption as a factual one.

As indicated in its memorandum of January 15, the court was most reluctant to grant plaintiffs a "windfall," when they were paid as highly skilled artisans. This problem was specifically discussed on pages 16 et seq. of the January 15 memorandum, and those comments are incorporated herein.

Notwithstanding the above considerations, the burden of establishing its good faith was on the defendant. The presence of good faith can only be judged by objective standards, and this court considered the following factors in reaching its determination that defendant did not act in good faith:

(a) there was an unsuccessful industry-wide attempt to exempt programmers as a class. The failure of this attempt was publicly known in 1971;

(b) regulations were issued on December 2, 1971 [38 CFR 541.207(c)(7) and 541.302(h)] which reflected that the status of programmers was a factual determination in each instance;

(c) the defendant introduced no evidence of a review of the activities of the plaintiffs or persons similarly employed to determine actual work being performed;

(d) the defendant had in its files evaluations for salary adjustment which reflect information sufficient to cause an inquiry;

(e) in addition to failing to make its own investigation, the defendant sought no assessments, evaluations, or opinions from any other source; and

(f) defendant's supervising staff knew or should have known the type of work which was performed by plaintiffs.

The factors cited above have convinced this court that defendant knowingly "took a chance" as the result of a conscious determination to disregard the mandates of the regulations issued pursuant to the provisions of the Fair Labor Standards Act. This constitutes bad faith under the provisions of the Portal to Portal Act. Liquidated damages are thus proper in this case.

An appropriate order will be entered.